1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID TURAN JOHNSON,

11              Petitioner,                    No. 2:08-cv-2035 WBS KJN P

12       vs.

13   IVAN CLAY,

14              Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding without counsel, with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2005 conviction on

19   two counts of second degree robbery.  The jury found petitioner used a firearm in the commission

20   of those offenses.  Petitioner was sentenced to 17 years and 4 months in prison.  Petitioner raises

21   four claims in his petition, filed August 29, 2008, that his prison sentence violates the

22   Constitution.  For the reasons stated herein, the undersigned recommends that petitioner's

23   application for a writ of habeas corpus be denied.

24   II.  Procedural History

25              Petitioner was tried with co-defendant Herman Johnson.  On May 9, 2005, a jury

26   found petitioner guilty of two counts of second degree robbery and four counts of assault with a

firearm.  (Clerk's Transcript ("CT"), lodged herein on Aug. 3, 2009, at 42-47.)   The jury also found petitioner used a firearm in the commission of the robberies.  (CT 42-43.)   Petitioner was sentenced to 17 years and 4 months in state prison.  (CT 100.)

Petitioner filed a timely appeal and on August 22, 2007, the California Court of Appeal for the Third Appellate District affirmed the judgment.[1]  (Lodged Document "LD" 11.[2]) His petition for review in the California Supreme Court was denied on October 24, 2007.  (LD 14.)

On April 10, 2008, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (LD 16.)  It was denied on April 17, 2008.  (LD 17.)

Petitioner then filed a series of habeas corpus petitions in the Sacramento County Superior Court.  (LD 18, 20, 22.)  Each petition was denied.  (LD 19, 21, 23.)  On August 29, 2008, petitioner filed the present petition for writ of habeas corpus in this court.  (Dkt. No. 1.)

III.  Facts[3]

On June 21, 2004, at the Madison Inn, a "party" motel, several Russian immigrants were drinking. When they went outside three Black men approached; when one man nodded, another pulled a gun and robbed the immigrants; the third Black man did nothing. David Johnson and Mitchell Green were arrested within the hour; David Johnson was wearing one victim's watch and another victims wallet was in the vehicle. Herman Johnson was found hiding days later.

Mitchell Green was discharged at the preliminary hearing, due to insufficient evidence that he aided the other defendants in the robbery, although he was present.

////

---

[1]  The appeals of petitioner and Herman Johnson were heard by the Court of Appeal at the same time and under the same case number.  Herman Johnson filed his own petition for writ of habeas corpus in this court.  This court denied that petition on September 13, 2010.  Johnson v. Knowles, 2:08-cv-02995 GEB CHS.

[2]  Respondent lodged the state court record herein on August 3, 2009.

[3]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Johnson, No. CO50093 (Aug. 22, 2007).  (LD 11.)

1            At trial David Johnson argued that the victims were so
2    intoxicated that they lacked the ability to perceive and recollect
     what actually happened that night; he also argued no gun was
3    involved. Herman Johnson argued that the witnesses misidentified
     him in one of two ways: Either the partiers saw him at the hotel
4    and mistook him for a robbery participant, or they mistook him for
     the robber who signaled the gunman, but instead he was the
5    passive bystander with the robbers, not one of the two robbers- in
     other words, the victims confused him for Mitchell Green.

6    (LD 11 at 1-2.)

7    IV.  <u>Standards for a Writ of Habeas Corpus</u>

8            An application for a writ of habeas corpus by a person in custody under a

9    judgment of a state court can be granted only for violations of the Constitution or laws of the

10   United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

11   interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991);

12   <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000).

13           Federal habeas corpus relief is not available for any claim decided on the merits in

14   state court proceedings unless the state court's adjudication of the claim:

15           (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as
16           determined by the Supreme Court of the United States; or

17           (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
18           State court proceeding.

19   28 U.S.C. § 2254(d).

20           Under section 2254(d)(1), a state court decision is "contrary to" clearly

21   established United States Supreme Court precedents if it applies a rule that contradicts the

22   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

23   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

24   result.  <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06

25   (2000)).

26   ////

1    Under the "unreasonable application" clause of section 2254(d)(1), a federal

2    habeas court may grant the writ if the state court identifies the correct governing legal principle

3    from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

4    prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

5    simply because that court concludes in its independent judgment that the relevant state-court

6    decision applied clearly established federal law erroneously or incorrectly.  Rather, that

7    application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

8    (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

9    question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

10   omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

11   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

12   Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

13   The court looks to the last reasoned state court decision as the basis for the state

14   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

15   decision, "and the state court has denied relief, it may be presumed that the state court

16   adjudicated the claim on the merits in the absence of any indication or state-law procedural

17   principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be

18   overcome by a showing that "there is reason to think some other explanation for the state court's

19   decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

20   Where the state court reaches a decision on the merits but provides no reasoning

21   to support its conclusion, the federal court conducts an independent review of the record.

22   "Independent review of the record is not de novo review of the constitutional issue, but rather,

23   the only method by which we can determine whether a silent state court decision is objectively

24   unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

25   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

26   basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must

determine what arguments or theories supported or, . . . could have supported, the state court's

decision; and then it must ask whether it is possible fairminded jurists could disagree that those

arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

786.

V.  Petitioner's Claims

     A.  Use of Peremptory Challenges

       Petitioner, who is African-American, claims that his conviction must be reversed

because the prosecutor exercised a peremptory challenge to strike an African-American male

juror on the basis of race, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

     1.  Proceedings in the Trial Court

       During voir dire, the prosecutor asked prospective Juror J.[4] about his educational

background.  (Augmented RT 230.)  Mr. J indicated that he had attended some college and that

his particular field of study was psychology.  Mr. J indicated that he was still interested in

psychology.  When asked whether he did anything to pursue the area of psychology on his own

time or in the community,  he responded:

> [MR. J]: What I more or less do, after going through the
> school and the college, is really helping people, and more or less
> like the homeless and young kids in my area and on my block.
>
> [PROSECUTOR]: Okay.
>
> [MR. J.]: The kids.
>
> [PROSECUTOR]: So are you trying to learn more about
> human psychology to assist --
>
> [MR. J.]: Not trying to learn, more just trying to help more.
>
> [PROSECUTOR]: Okay.

////

---

[4] While the surnames of the jurors are identified in the state court transcript, this court
refers to jurors by the initial letters of their surnames in both the text and in quotations to the
state court record.

1

2

> [MR. J.]: Because I know the situations that they're in and
> stuff like that.  And yeah, just to help.

3  (Augmented RT 230-31.)  Mr. J. clarified that he was referring to homeless people and stated that

4  he also takes care of his family.  Mr. J. affirmed that pursuing or studying the field of psychology

5  helps him in these endeavors.  When asked if he volunteered in any programs to help homeless

6  people, Mr. J. responded:

7

> [MR. J.]: No.  What I do is not volunteer - yes, I more or
> less volunteer to help.  It's a few companies that I help out.

8

> [PROSECUTOR]: That you help out?

9

> [MR. J.]: Yes.

10

> [PROSECUTOR]: That in turn help out the homeless?

11

12

> [MR. J.]: Uh-huh.  Young kids and families and stuff like
> that.

13

> [PROSECUTOR]: And how do you assist them?

14

> [MR. J.]: Like over the weekends, when I'm off of work, or
> when I take my vacation, just go to those situations.

15

16

> [PROSECUTOR]: And you're helping people in the
> community that are homeless?

17

> [MR. J.]: Uh-huh.

18  (Augmented RT 231-32.)  Mr. J. agreed that some of the homeless people he helped suffered

19  from mental illness or had contact with the criminal justice system.  Mr. J. said that he did not

20  obtain a degree in psychology; he was drafted into the military.  (Augmented RT 233-34.)  While

21  in the military Mr. J. participated in two court-martial proceedings.  Mr. J was questioned and

22  responded as follows regarding his experiences:

23

> [PROSECUTOR]: ...And you indicated that you did serve
> on at least two court-martials while in the Air Force.

24

> [MR. J.]: (Nods head.)

25

> [PROSECUTOR]: Yeah?

26

1     [MR. J.]: Yeah.

2     [PROSECUTOR]: And that, from my limited
understanding of it, it is a lot smaller of jurisdictional venue or jury
3 than in this case?

4     [MR. J.]: Oh, yes.

5     [PROSECUTOR]: Than in our country or even in state
law?

6

7     [MR. J.]: Uh-huh.

     [PROSECUTOR]: Sometimes you people who are under a
8 court-martial can be judged by a group of people in the military as
small as four?

9

     [MR. J.]: Right.
10

     [PROSECUTOR]: Like four or six people are judging the
11 facts.  Right?

12     [MR. J.]: Yes.

13     [PROSECUTOR]: Nothing like the twelve that we talk
about here?

14

     [MR. J.]: Uh-huh.  That's right.  Really don't have no one.
15 More or less told to -- just standing there, working there.  And the
whole situation came out.  What had happened, I can't talk about.

16

     But in those situations, you have to more or less go back to,
17 you know -- before it goes bad, you know.  You don't have -- it's
something that, you know, someone else is doing.  Not help them,
18 it can hurt them.  And he was doing something wrong, the person
was, so -- but the reason why that happened, he was drinking that
19 night, and so that's what -- pretty much what happened.

20     [PROSECUTOR]: So when you think about the court-
martial process, were you being asked to listen to the facts of
21 another soldier or officer --

22     [MR. J.]: Uh-huh.

23     [PROSECUTOR]: -- who was being court-martialed?

24     [MR. J.]: Yes.

25     [PROSECUTOR]: Had you ever been on the other side of
that, like where you were the one sort of on trial?

26

1           [MR. J.]: No.

2           [PROSECUTOR]: Okay, so you've always been sort of a
fact finder?

3

4           [MR. J.]: Yes.

5           [PROSECUTOR]: And how did you feel about that
process?

6           [MR. J.]: Like you says, one that I had to be at.  But you
know, I had to be there.

7

8           [PROSECUTOR]: Okay.  And is there any feelings that
linger from those experiences?  We're talking a little while ago.
Right?

9

10         [MR. J.]: Uh-huh.

11         [PROSECUTOR]: That make you hesitant to sort of join a
larger group along the same lines and listen to the facts in this
case?

12

13         [MR. J.]: No.  Not any more.  No.  Just maintain my
business, and that's it in the service.

14         [PROSECUTOR]: And in court-martials, is it a situation
where you knew the person being court-martialed?

15

16         [MR. J.]: Uh-huh.

17         [PROSECUTOR]: Okay.  And is that -- does that -- did that
make it worse or better as far as your ability to sit in judgment?

18         [MR. J.]: More or less like you was saying, and like they
was indicating, everybody knew each other.  So it wasn't that you
didn't know what was going on in situations like that.  Just more or
less, honestly, tell the truth.  Didn't have no choice.  It wasn't make
up a situation.  The military doesn't work like that, because there's
only so many people there.  You can't be saying situations -- stuff
like you can hear out of the services.  You just don't go for that,
because it doesn't exist, and you can't say it does.

19

20

21

22         [PROSECUTOR]: Okay.  Are you talking like excuses?

23         [MR. J.]: Yeah.  Exactly.

24         [PROSECUTOR]: Okay.  Things that may happen or
excuse conduct outside of military court [don't] seem to apply?

25

26         [MR. J.]: Yes.

[PROSECUTOR]: Is what you're saying?

[MR. J.]: Yes.

[PROSECUTOR]: And how do you have -- how do you feel about that, given this scenario?

[MR. J.]: This is much better.  The situations is you have more freedom, because like I was indicating there, there you're there.  Get locked up, you're locked up.  And that's a lock up you don't want, put in that situation.

[PROSECUTOR]: Very good.  Thank you.

(Augmented RT 233-36.)  After further questioning of all the prospective jurors, all attorneys

passed for cause.  (Augmented RT 256.)

During peremptory challenges, the prosecutor excused Mr. J.  (Augmented RT

258.)  Petitioner's attorney asked to approach.  After the jury was excused, petitioner's attorney

stated she was making a "Batson/Wheeler" challenge, and was also challenging the jury pool as a

whole for  lack of diversity.  She noted that out of the approximately seventy jurors remaining,

only three were African-American.  Petitioner's attorney argued that Mr. J. was present

throughout selection process and appeared to be interested in what was going on, and was

responsive to questions.  She argued that there was "nothing exciting" about Mr. J.'s

questionnaire in that he had no contact with law enforcement, no victimization history, no arrest

history, and was a member of the military.  (Augmented RT 260.)  She also stated that the

prosecutor spent the majority of her individual questioning focusing on Mr. J.  Co-defendant H.

Johnson's attorney noted that Mr. J. was the only African-American left in the panel at the time

of challenge and joined in the motion.  (Augmented RT 261-62.)

The court made several observations, including that the questioning of Mr. J. was

not desultory when compared to questioning of the other members of the panel, that the

defendants are of the same racial group as the challenged jurors, and that the victims are of a

different racial group.  (Augmented RT 268-69.)  The court further observed:

9

1    THE COURT: We just lost a female Asian juror, Ms. K.,
     because of her medical problems. And I think [petitioner's
2    counsel] is correct, and I don't - that we have lost several minority
     jurors. And I don't think she's - and she hasn't contended that
3    there was anything improper or unreasonable about the excuses in
     those cases, although I think that she had some concerns about -
4    which one was it?

5    [PROSECUTOR]: Mr. S.

6    THE COURT: Mr. S.   It may have been Mr. S. that she
     voiced an objection to, and he was African American.
7
     [PETITIONER'S COUNSEL]: From memory, there were -
8    I believe there were four African American jurors who, besides Mr.
     S., through no fault of anyone's, had legal excuses to leave this
9    jury panel.

10   (Augmented RT 269-70.)

11       The court noted that besides Mr. J., there were other minority jurors remaining,

12   and that no pattern of challenges existed against a particular cognizable group.  (Augmented RT

13   270-71.)  The court asked the prosecutor to explain her reasons for excusing Mr. J.:

14       [PROSECUTOR]: Certainly.  On Mr. J.'s questionnaire,
         there are at least four misspelled words, one of which is the word
15       that inquires whether or not he has earned any degrees.  And you'll
         recall that I asked Mr. J. whether he had a degree -- or what area
16       did he study, because I cannot tell from the way it's misspelled
         whether its psychology or physics or something.
17
         He ended up saying that the field of study was psychology.
18       The way he's written it on his juror questionnaire is P-S-H-Y-I-C.

19       It is my intention in this case, given the potential for an
         identification expert to testify in this case, to stay away from any
20       juror from a background in psychology.  That was one of the areas
         I was going to voir dire about, and the Court told me that I was not
21       going to be allowed to get into that.  So I left it at an inquiry of
         people with backgrounds in psychology or those who are trained in
22       psychology or have an over-familiarity with the topic, which Mr. J.
         seemed to have.
23
         In addition, I'm generally always interested in people who
24       have been in the military.  However, I got more confused after I
         inquired of Mr. J. about his experience with the court-martials.  He
25       indicated that he was always on the side of the fact finder and
         never court-martialed himself.  He spoke of those people being
26       court-martialed as being limited by virtue of the military justice

10

1   system in the excuses that they could use.  In other words, the
2   excuses that work in the outside world don't work in the military
    world.

3       That concerned me for this case, because he seemed- and
    then getting into the work that he said he did with-
4
5       THE COURT: You're saying that -- I, quite frankly, I must
    confess, had some trouble understanding him when he was
    speaking.  Did anybody else have that situation? [Co-defendant D.
6   Johnson's counsel], did you understand everything he was saying?
    And I don't mean in a grammatical structure sense, I just mean -
7
        [PROSECUTOR]: His train of thought.
8
        THE COURT: Pardon me?
9
        [PROSECUTOR]: His train of thought.
10
        THE COURT: I'm talking to [petitioner's counsel].
11
        [PETITIONER'S COUNSEL]: His dialect?
12
        THE COURT: No, his mumbling, his not speaking
13  distinctly.  Did you have any trouble understanding him?

14      [PETITIONER'S COUNSEL]: At times I did.

15      THE COURT: How about you, [CO-DEFENDANT H.
    JOHNSON'S COUNSEL]?
16
        [CO-DEFENDANT H. JOHNSON'S COUNSEL]: Not -- I
17  understood most of the things he said.

18      THE COURT: What I'm thinking about doing is having his
    -- the dialogue between he and [the prosecutor] read back to us all.
19
        [PROSECUTOR]: I don't know if it was a function of his
20  dialect or a function of me not hearing what he was saying, but at
    times I had difficulty, but I understood overall what he was saying.
21  A lot of jurors have spoken -- or one juror in particular, memorable
    juror, you had to tell to speak up.
22
        THE COURT: All right.  So [prosecutor], are you saying
23  when you were talking to him about the court-martial, he -- his
    statement was that, in effect, that he was concerned about the
24  fairness, although he didn't say it in that many words, of a military
    court-martial, in that excuses that might have worked on the
25  outside didn't work in the military?  Is that what he said?

26  ////

                                11

> [PROSECUTOR]: That's what I gathered, yes.  And his statements that it was like a horrible place to be, you wouldn't want to be in that place, i.e., the person being court-martialed, I got the sense that he felt sorry for them.
>
> And I had a concern that perhaps then, and now in this case, he may base a decision in this case on emotion.  And I had to lean forward quite a bit to listen to him.  And I was understanding less and less, and so I just kind of stopped asking him questions.
>
> But I believe my conversation with him ended on how he was helping the homeless and mentally ill, and what he did on his weekends, and how he helped them.  And again, he seemed liberal-minded in the sense that he would base a decision on emotion because he felt sorry for the people.

(Augmented RT 272-75.)  The trial court inquired whether the prosecutor had any other reasons.  She responded:

> [PROSECUTOR]: Those are mainly my reasons.  I'm looking for -I mean, the spelling errors concern me.  That's about it.
>
> THE COURT: Now, the spelling error, I see where under degrees he misspelled, what, physics?
>
> [PROSECUTOR]: I think that's supposed to be psychology, an abbreviation for psychology.
>
> THE COURT: All right.  So that's misspelled.  What other misspellings?
>
> [PROSECUTOR]: Under previous employer on the right side of the form, I believe it's supposed to say Unisource Company.
>
> Under question number four regarding information regarding information regarding spouse or other adults with whom you reside, the occupation is listed as wild, and then it's animal spelled A-N-A-I-M-A-L.
>
> And then the employer listed right under that under question four is federal.  I guess that's spelled correctly.

(Augmented RT 275-76.)

////

////

The court asked the prosecutor about the connection between people with a background in psychology and whether or not the defense called an expert witness; she responded:

> [PROSECUTOR]: Yes.  It had been my intent to voir dire on and try and seek out people who may give undue weight to an identification expert, given that they have studied or have trained in the area of psychology or have an over-familiarity with a topic.
>
> Also seek out and ferret out those jurors -- potential jurors who may be vulnerable to or be likely to be unduly influenced by the testimony of a forensic psychologist.
>
> THE COURT: A forensic psychologist?
>
> [PROSECUTOR]: I don't even have the CV of the potential ID expert in this case.  I have a CV from 1999.  I think he's a medical doctor, but I'm not sure.  This is a general outline of an area of inquiry that I use in cases with identification experts.  It's typed out.  I've used it in other cases.  It's an area that I explore in voir dire.
>
> THE COURT: So I understand you correctly, your concern is that if [co-defendant H. Johnson's counsel] does manage to locate and have testify an eyewitness expert, that to a large extent those persons have some background in psychology.  Is that what you are saying?
>
> [PROSECUTOR]: Yes.
>
> THE COURT: And you feel that people that have a background in psychology themselves, as potential jurors, might tend to be more empathetic toward such an expert?
>
> [PROSECUTOR]: Not necessarily sympathetic, but just I don't want any juror knowing any more than any other juror by virtue of their background.  In other words, have some outside knowledge that they would tap into, because a lot of what psychology is, is studies.  And that's what a lot of times these identification experts testify about, is statistical studies.

(Augmented RT 276-77.)

Petitioner's attorney and co-defendant D. Johnson's attorney were heard on the issue, and argued against the prosecutor's proffered reasons.  Among other things, defense counsel noted that the prosecutor spent more time questioning Mr. J. compared to other jurors

1   and argued that her reasoning was contradictory in that she implied that he was both too educated

2   because of his psychology background and not educated enough because of the spelling errors.

3   (Augmented RT 277-80.)

4          The court recessed and indicated its desire to review Mr. J's entire statement due

5   to the difficulty understanding his responses.  (Augmented RT 280-81.)  The following day the

6   court noted that it had received and reviewed the transcript and that copies had been provided to

7   the parties.  The court then made the following statement:

8          THE COURT: Okay.  Just while this one situation is in my
           mind, I know the law says that you're not supposed to think of
9          excuses for the prosecutor, but back on this issue of trying to
           understand what Mr. J. was saying, when I looked at that transcript,
10         it wasn't so much that I couldn't hear what his words were - and
           the word I was looking for was syntax.  When you read the
11         transcript, it's hard to understand what he was saying.

12         But that's just about it as far as explanation as to some of
           the things.  Like when [the prosecutor] was making her arguments
13         yesterday, I suspected that she was right, but I couldn't really recall
           what was said, and that's why I had the transcript typed up.

14
           So you can say, "Well, Judge, you should have stopped him
15         and told him to speak up."  But that wasn't the point that he wasn't
           speaking up.  I just had trouble understanding him.

16

17   (Augmented RT 284.)

18         The trial court summarized the law in the area and then made the following

19   findings:

20         Number one, [the prosecutor] was concerned about three
           misspellings on his questionnaire.  This is the type of thing that
21         does not go unnoticed by the attorneys on either side of the counsel
           table, and generally is looked upon as a negative factor in the
22         equation.  Whether or not this shortcoming can be characterized as
           relatively minor, there can be no doubt it is a legitimate concern.

23
           This Court is not required then to perform a comparative
24         analysis of the other jurors' questionnaires to determine how many
           of them have misspellings and whether the jurors that she excuses
25         have or have not misspellings in their questionnaires.  This does
           not note as a comparative analysis.  In that regard it's not required.

26   ////

14

This does not mean that the defense is precluded from making relevant arguments in that regard.

The prosecutor has stated that from her perspective, she has misgivings about Mr. J.'s background in psychology, because if the defense were to produce an expert in the area of eyewitness identification, that expert's background normally is based, to a large extent, upon psychology, which, in her opinion, then would appeal more to a person with a similar type background, such as Mr. J.

There's nothing inherently or patently disingenuous about her explanation in this regard.

[The prosecutor] mentions and is concerned that Mr. J. is very interested and involved in helping the homeless and volunteers his time to help them. Commendable as that is, this prosecutor's concerned this activity evinces a liberal mind-set, which, in her opinion, does not make a good juror for the prosecution.

Again, this Court finds that this is a legitimate reason for the exercise of the challenge, and is not a sham or pretext to cover a desire to deprive the defendant of the equal protection of the law.

Regarding the juror's experience on two court-martials while in the military, the prosecutor felt that, even though he wasn't the one being prosecuted, that he had concerns about -- arguably about the fairness of the military court-martial process.

In this regard I did have the transcript prepared. It's somewhat difficult to discern from the cold transcript what Mr. J.'s concerns were, but it seems like he was stating that, in effect, that the military situation is not -- seemed not as fair as what we have here. And again, from the prosecutor's perspective, she indicated that she's concerned that this is a juror who might be inclined to judge the evidence emotionally rather than objectively.

There's nothing inherently suspect about the prosecutor's reasoning. Some might disagree with her conclusions, but the court finds they are genuine and not contrived.

Accordingly, the court finds that the defense has failed to establish or satisfy their burden of proof that the prosecutor impermissibly excused Mr. J. for reasons prohibited by the prescriptions of Wheeler/Batson and their progeny. So the defense motion to dismiss the venire is denied.

(Augmented RT 288-90.)

////

2.  <u>Court of Appeal Decision</u>

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The appellate court addressed this claim as follows:

> Defendants contend the trial court should have granted their <u>Batson-Wheeler</u> motion due to the prosecutor's alleged race-based exercise of a single peremptory juror challenge. (<u>Batson v. Kentucky</u> (1986) 476 U.S. 79 [90 L.Ed.2d 69]; <u>People v. Wheeler</u> (1978) 22 Cal.3d 258.) We find no error.
>
> The trial court found defendants established a prima facie case of racial discrimination in the prosecutor's exercise of a peremptory challenge to juror J, a Black male who had served on two court-martial panels while in the Air Force. In response to the trial court's invitation, the prosecutor explained that J misspelled words on his questionnaire (including "pshyic" for "psychology"), had a psychology background, seemed "sorry" for people who had been court-martialed and, based on J's work with mentally ill and homeless people, "seemed liberal-minded in the sense that he would base a decision on emotion because he felt sorry for the people." In particular, since it was at that point not known whether or not Herman Johnson was going to have a psychologist testify as to the problems with cross-racial identification, the prosecutor was leery of having any jurors with psychology backgrounds serve in this case.
>
> The trial court stated that J was hard to understand due to his mumbling, and the prosecutor at one point said, "I was understanding less and less, and so I just kind of stopped asking him questions." Because the trial court found J so hard to understand he wanted a readback or transcript of J's voir dire so the court could consider it before ruling on the defense motion.
>
> The next morning the court had reviewed a transcript of J's voir dire and realized the problem was not so much J's mumbling but his syntax. We give an example. When the prosecutor asked J whether knowing the person being court-martialed had made serving on a court-martial "worse or better" he replied:
>
> > "More or less like you was saying, and like they was indicating everybody knew each other. So it wasn't that you didn't know what was going on in situations like that. Just more or less, honestly, tell the truth. Didn't have no choice. It wasn't a make up a situation. The military doesn't work like that, because there's only so many people there. You can't be saying situations – stuff like you can hear

16

out of the service. You just don't go for that, because it doesn't exist, and you can't say it does.

When the prosecutor tried to clarify if J meant that more excuses worked outside of the military he seemed to agree and when she asked how he felt about that J said:

"This is much better. The situations is you have more freedom, because like I was indicating there, there you're there. Get locked up, you're locked up. And that's a lock up you don't want, put in that situation."

The trial court denied the motion, finding each of the prosecutor's stated reasons was legitimate and race-neutral; in particular the court mentioned J's comparisons of serving on court-martial juries with serving on this jury.

In upholding a challenge, a trial court need not agree with the reasons, but must find that they are genuine, specific and free of bias. They can be subjective or trivial, including body language, attitude, lack of attention and so forth. (People v. Arias (1996) 13 Cal.4th 92, 136; Wheeler, supra, 22 Cal.3d at p. 275; People v. Allen (2004) 115 Cal.App.4th 542, 547; People v. Walker (1998) 64 Cal.App.4th 1062, 1067.)

The ultimate issue is the persuasiveness of the reasons in light of the record, that is, whether the record supports the trial court's finding that the challenge is lawful. (See Miller-El v. Cockrell (2003) 537 U.S. 322 338-339 [154 L.Ed.2d 931, 951] (Miller-El I); People v. Reynoso 2003) 31 Cal.4th 903, 907-908 (Reynoso).) Formal findings are not needed:

"Where . . . the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a Batson/Wheeler motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (Reynoso, supra, 31 Cal.4th at p. 929.)

17

The trial court determines whether the stated reason is genuine and free from discriminatory intent, upon a reasoned evaluation of the prosecutor's explanation. (People v. Hall 35 Cal.3d 161, 167-168.) The appellate court gives great deference to the trial court's finding. (People v. Ervin (2000) 22 Cal.4th 48, 74-75; Reynoso, supra, 31 Cal.4th at pp. 918-919.) But deference is not abdication:

> "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (People v. Silva (2001) 25 Cal.4th 345, 386.)

Defendants argue Miller-El v. Dretke (2005) 545 U.S. 231 [162 L.Ed.2d 196] (Miller-El II) wrought fundamental changes in this area of law. We agree that Miller-El II is a significant case, but it did not change the Batson framework:

> "The fundamental inquiry remains the same after [Miller-El II] as before: Is there substantial evidence to support the trial court's ruling that the prosecutor's reasons for excusing prospective jurors were based on proper grounds, and not because of the prospective jurors' membership in a protected group? If so, then defendant is not entitled to relief. In undertaking this inquiry, we note that the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects." (People v. Huggins (2006) 38 Cal.4th 175, 233.)

Contrary to the defense view, the trial court did not state that "any trivial explanation" was enough; the trial court explicitly found that the explanations given were legitimate, that is, sincere and race-neutral. The record supports the prosecutor's concern that J viewed himself as a do-gooder who might take pity on a defendant for extra-legal reasons.

Further, although acknowledging at one point that the trial court should not "view[ ] each of the prosecutor's stated reasons in isolation[,]" defendants dissect each reason and advance alternative interpretations or inferences. For example, while poor spelling may be a trivial reason in many circumstances, here J misspelled

"psychology," which was a subject he supposedly had studied. Further, J's study of psychology and his social work support the prosecutor's concern that he could have a "liberal" mindset, and a prosecutor may choose to strike "do-gooders" off of a jury without running afoul of the <u>Batson</u> rules. (<u>See</u>, <u>e.g.</u>, <u>People v. Landry</u> (1996) 49 Cal.App.4th 785, 790-791; <u>People v. Perez</u> (1996) 48 Cal.App.4th 1310, 1315.)

Defendants separately claim the trial court erred by failing to engage in "comparative juror analysis." However, they failed to develop such an argument in the trial court and nothing in <u>Miller-El II</u>, <u>supra</u>, 545 U.S. 231 [162 L.Ed.2d 196] requires a trial court to perform such an analysis on its own motion. The trial court indicated the defense was free to make a comparative analysis. Further, defendants do not fairly develop their appellate claims by reference to truly comparable factors, no doubt because of the lack of a record to support valid comparisons. For example, appellate counsel states, "It is highly likely that other jurors made comparable spelling errors[,]" but because the issue was not explored in the trial court, there is no record to support such assertion.

Further, the Attorney General has illustrated other flaws in the comparative points proffered on appeal. The prosecutor struck the only other two jurors who indicated they had studied psychology. Whether other jurors who had college degrees or otherwise seemed educated might have taken some psychology courses is not revealed by the record, because trial counsel failed to make a comparative analysis in the trial court. Another juror who had served in the military had also served on two civilian juries, one civil and one criminal, and did not express unusual sentiments about that experience. Thus, his background was not comparable to J's in this regard.

The fact the prosecutor spent more time questioning J is explained by the confusion in J's answers, as the trial court impliedly found. Therefore, the record does not support the claim that the prosecutor improperly singled J out for disparate questioning. That the prosecutor did not question a juror who believed her son had been treated too harshly on drug charges, a juror whose sister was a public defender, a juror who was a probation officer and a juror who had a drunk-driving conviction does not reflect any nefarious purpose in her questioning of J nor in her decision to challenge J, despite counsel's assertion that these factors should have raised "red flags" about those other jurors. Had a comparative analysis been made in the trial court, perhaps a record supporting the assertion of disparate questioning could have been made, but on this record the claim is untenable.

On this record we uphold the trial court's ruling.

19

1   (LD 11 at 6-11.)

2            3.  Analysis

3            Purposeful discrimination on the basis of race or gender in the exercise of

4   peremptory challenges violates the Equal Protection Clause of the United States Constitution.

5   See Batson, 476 U.S. at 79; Johnson v. California, 545 U.S. 162 (2005).  Batson claims are

6   evaluated pursuant to a three-step test:

> First, the movant must make a prima facie showing that the
> prosecution has engaged in the discriminatory use of a peremptory
> challenge by demonstrating that the circumstances raise "an
> inference that the prosecutor used [the challenge] to exclude
> veniremen from the petit jury on account of their race."  Second, if
> the trial court determines a prima facie case has been established,
> the burden shifts to the prosecution to articulate a [gender]-neutral
> explanation for challenging the juror in question.  Third, if the
> prosecution provides such an explanation, the trial court must then
> rule whether the movant has carried his or her burden of proving
> the existence of purposeful discrimination.

13  Tolbert v. Page, 182 F.3d 677, 680 (9th Cir. 1999) (en banc) (internal citations omitted).

14           In order to establish a prima facie case of racial discrimination, petitioner must

15  show that "(1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor

16  used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

17  inference that the strike was motived by race."  Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir.

18  2006) (citing Batson, 476 U.S. at 96 and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th

19  Cir. 2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

20  evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

21  purpose.'"  Johnson, 545 U.S. at 169 (quoting Batson, 476 U.S. at 94.)  In evaluating whether a

22  defendant has established a prima facie case, a reviewing court should consider the "'totality of

23  the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike."  Boyd,

24  467 F.3d at 1146 (quoting Batson, 476 U.S. at 94, 96).  This should include a review of the entire

25  transcript of jury voir dire in order to conduct a comparative analysis of the jurors who were

26  stricken and the jurors who were allowed to remain.  Boyd, 467 F.3d at 1050 ("We believe,

however, that Supreme Court precedent requires a comparative juror analysis even when the trial court has concluded that the defendant failed to make a prima facie case"); see also Miller-El v. Dretke, 545 U.S. 231 (2005) (utilizing comparative analysis, in a case in which a prima facie showing had been made, to determine whether the prosecutor had been motived by racial bias in exercising peremptory challenges).

At the second step of the Batson analysis, "'the issue is the facial validity of the prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 360 (1991). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." Id. at 360. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." Stubbs v. Gomez, 189 F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360). For purposes of step two, the prosecutor's explanation need not be "persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765, 768 (1995). Indeed, "[t]o accept a prosecutor's stated nonracial reasons, the court need not agree with them." Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006). "It is not until the *third* step that the persuasiveness of the justification becomes relevant--the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Purkett, 514 U.S. at 768 (emphasis in original). The question is whether, after an evaluation of the record pertaining to that particular case, the prosecutor's race-neutral explanation for a peremptory challenge should be believed. Id.

In the third step of a Batson challenge, the trial court has "the duty to determine whether the defendant has established purposeful discrimination," Batson, 476 U.S. at 98, and, to that end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons. See Purkett, 514 U.S. at 768. In determining whether petitioner has carried this burden, the Supreme Court has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" Batson, 476 U.S. at 93 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)); see also Hernandez, 500 U.S. at 363.

21

1  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for

2  purposeful discrimination."  Purkett, 514 U.S. at 768; see also Lewis v. Lewis, 321 F.3d 824,

3  830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or

4  many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.")

5  In step three, the court "considers all the evidence to determine whether the actual reason for the

6  strike violated the defendant's equal protection rights."  Yee v. Duncan, 463 F.3d 893, 899 (9th

7  Cir. 2006).  A reviewing court must evaluate the "totality of the relevant facts" to decide

8  "whether counsel's race-neutral explanation for a peremptory challenge should be believed."  Ali

9  v. Hickman, 584 F.3d 1174, 1180 (9th Cir. 2009).  "A court need not find all nonracial reasons

10  pretextual in order to find racial discrimination."  Kesser, 465 F.3d at 360.

11          Petitioner bears the burden of persuasion to prove the existence of unlawful

12  discrimination.  Batson, 476 U.S. at 93.  This "ultimate burden of persuasion . . . rests with, and

13  never shifts from, the opponent of the strike."  Purkett, 514 U.S. at 768.  However, "the

14  defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory

15  challenges constitute a jury selection practice that permits 'those to discriminate who are of a

16  mind to discriminate.'"  Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562

17  (1953)).

18          In this case, the prosecutor articulated several reasons for excusing Mr. J.,

19  including that (1) he had misspelled and/or incorrectly abbreviated the field of study which he

20  reportedly pursued in college; (2) that field of study was psychology, which concerned the

21  prosecutor because of the potential for expert witness testimony from an identification expert;[5]

22  (3) he had twice served as a fact finder in military court martial proceedings and gave vague and

23

24       [5]  Petitioner argues that it was known at the time of voir dire that his co-defendant's
counsel had given up on getting an identification witness.  (Dkt. No. 23 at consec. p. 14.)  The

25  Court of Appeal noted that "it was at that point not known whether or not Herman Johnson was
going to have a psychologist testify as to the problems with cross-racial identification."  (LD 11

26  at 6.)  Petitioner has cited nothing in the record to contradict this statement and this court is thus
required to presume its truth.  28 U.S.C. § 2254(f).

1   confusing responses when asked about these experiences; and (4) he worked with and/or

2   volunteered time helping homeless and mentally ill individuals, and appeared to the prosecutor to

3   be a "liberal type" person who might base a decision on emotion.

4              The prosecutor's concern about petitioner's background in psychology and his

5   interest in helping the homeless and mentally ill falls within the well-settled rule that both

6   occupation and interest or experience in social service or similar fields are permissible, non-

7   discriminatory reasons for exercising peremptory challenges.  See generally Hall v. Luebbers,

8   341 F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible reason to defend against a

9   Batson challenge, and being a social worker could be a legitimate basis to strike a prospective

10  juror."); United States v. Smith, 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor's stated reason to

11  strike a potential juror because she was "a social worker type" who would be "too sympathetic

12  towards the defendants" was found non-racial); United States v. Thompson, 827 F.2d 1254, 1260

13  (9th Cir. 1987) ("Excluding jurors because of their profession, or because they acquitted in a

14  prior case, or because of a poor attitude in answer to voir dire questions is wholly within the

15  prosecutor's prerogative.").

16             It is also well settled that a previous negative experience with law enforcement or

17  the judicial system constitutes an acceptable, race-neutral explanation for striking a potential

18  juror.  See Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004).  The prosecutor's concern that

19  Mr. J. appeared to feel sorry for people involved in court martial proceedings is valid based on

20  this general rule.  See Tolbert v. Gomez, 190 F.3d 985, 989 (9th Cir. 1999) ("Challenging a

21  prospective juror on the basis of his expressed opinions about the judicial system does not violate

22  Batson.").

23             The reasons articulated by the prosecutor are facially valid.  Moreover, a review of

24  the record does not indicate that any of those reasons were pretextual.  In such a situation, a

25  comparative juror analysis is an additional tool to evaluate the plausibility of a prosecutor's

26  stated reasons in light of all the evidence.  Miller-El v. Dretke, 545 U.S. 231 (2005); see also

Kesser, 465 F.3d at 361 ("in Miller-El, the [Supreme] Court made clear that the comparative

analysis is required even when it was not requested or attempted in the state court").  Petitioner

claims Miller-El requires comparative analysis of the jury questionnaires.  (Dkt. No. 1 at consec.

p. 7.)  It does not.  The voir dire transcript may provide a basis for the comparative analysis

where, as here, the juror questionnaires were not presented as part of a comparative analysis in

state court.  Miller-El, 545 U.S. at 241 n.2; cf. Kesser, 465 F.3d at 261.  Petitioner cites no other

authority for this proposition that either the state court or this court is required to obtain the juror

questionnaires to conduct a comparative analysis.  Further, petitioner has not made a showing of

success on the merits of this claim to justify an evidentiary hearing for the purposes of comparing

the questionnaires.  See Cullen v. Pinholster, 131 S. Ct. 1388 (2011) ("evidence introduced in

federal court has no bearing on section 2254(d)(1) review").

Here, a comparative juror analysis is beneficial to examining some, but not all of

the prosecutor's given reasons.  For example, the fact that Mr. J. misspelled what appeared to be

an abbreviation for psychology, his field of study in college, is a circumstance that was isolated

and unique to him.  Likewise, there is no indication that any other juror reported working with

the homeless or mentally ill. On the other hand, the record indicates that two other jurors had

backgrounds in psychology.  Prospective Juror M. indicated that she had obtained a bachelor's

degree in psychology, while Juror S. had studied art/psychology but had not obtained a degree.

(Augmented RT 322, 354.)  The prosecutor exercised peremptory challenges as to both Juror M.

and Juror S.  (Augmented RT 357-58.)  While petitioner argues that the prosecutor only

questioned jurors about their psychology backgrounds after defense counsel made the

Batson/Wheeler motion to legitimize his reasons for striking Mr. J., petitioner does not show the

questioning of Jurors M. and S. differed from the questioning prior to the motion.  (Dkt. No. 23

at consec. pp. 12, 13-14.)  Absent such a showing, this court cannot find the strikes against Jurors

M. and S. to be part of an alleged pretext.

Another potential juror reported prior service in the military.  This potential juror,

identified in the relevant portion of the record as Juror Number Eight, indicated that he had

retired from the Air Force; it was also discussed that he had previously served on two juries in

superior court. (Augmented RT 316-17.)  Unlike Mr. J., however, there was nothing vague or

confusing about Juror Number Eight's responses regarding these past experiences.  Accordingly,

similar concerns to those the prosecutor had regarding Mr. J. did not arise from Juror Number

Eight's responses about the military and the criminal justice system.

Petitioner has failed to carry his burden of proving the state court's determination

of this claim was unreasonable.  He has not shown the existence of unlawful discrimination with

respect to the prosecutor's  challenge to Mr. J.  Put simply, Mr. J.'s responses during voir dire

were difficult to follow.  In addition, he had completed some years of college, and reported a

background and current interest in psychology, yet misspelled what appeared to be an

abbreviation of that word.  Mr. J. also volunteered his time helping less fortunate members of the

community, and did not appear to have a positive memory of his prior experience in the military

criminal justice system.  The prosecutor expressed reasonable bases for her use of a peremptory

challenge against Mr. J., and those reasons are not undermined by anything in the record.  The

trial court's determination that those reasons were credible is entitled to "great deference."

Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011).  The California courts' rejection of petitioner's

claim is not contrary to, or an unreasonable application of the Batson standard, nor based on an

unreasonable determination of the facts in light of the evidence.  Accordingly, petitioner's claim

regarding the prosecutor's use of peremptory challenges should be denied.

B.  Alleged Prosecutorial Misconduct

Petitioner alleges three incidents of prosecutorial misconduct: (1) the prosecutor

violated a court order by introducing irrelevant hearsay regarding the missing victim-witness

Geouard; (2) the prosecutor improperly vouched for two witnesses; and (3) the prosecutor made

inappropriate racial references.

Federal habeas review of prosecutorial misconduct is limited to the issue of

1   whether the conduct violated due process.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986);

2   Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000); Thomas v. Borg, 74 F.3d 1571, 1576

3   (9th Cir. 1996).  Prosecutorial misconduct violates due process when it has a "substantial and

4   injurious effect or influence in determining the jury's verdict."  See Ortiz-Sandoval v. Gomez, 81

5   F.3d 891, 899 (9th Cir. 1996) (quoting O'Neal v. McAninch, 513 U.S. 432, 443 (1995)).  A

6   claimant must show "first that the prosecution engaged in improper conduct and second that it

7   was more probable than not that the prosecutor's conduct materially affected the fairness of the

8   trial."  United States v. Smith, 893 F.2d 1573, 1583 (9th Cir. 1990) (citation omitted).  If left

9   with "grave doubt" whether the error had substantial influence over the verdict, a court should

10   grant collateral relief.  Brecht v. Abrahamson, 507 U.S. 619, 631 (1993); Ortiz-Sandoval, 81 F.3d

11   at 899.  This analysis is, of course, also circumscribed by the scope of this court's review on

12   habeas corpus.  Petitioner can only prevail if the state court's decision on these issues was

13   contrary to or an unreasonable application of the law or based on an unreasonable construction of

14   the facts.

15       1.  Absent Witness

16          a.  Background

17       Prior to trial, it became apparent that two of the robbery victims, Alex Alekseyev

18   and Geouard Dauterive, would not appear to testify, despite having been validly subpoenaed.

19   (RT 161-68.)  Petitioner's requests that the court take judicial notice of this fact were denied.

20   (RT 173; 249.)

21       Detective Chris Wilder testified at trial.  Detective Wilder said that he created a

22   photographic line-up which included petitioner's photograph.  (RT 827.)  During his direct

23   examination the following exchange occurred:

24       Q:   On that same date, June 23rd of last year, did you meet with
             Geouard Dauterive?

25       A:   Yes, I did.

26

1      Q:    Where did you meet with him?

2      A:    In the lobby of the Madison Inn.

3      Q:    And what was the purpose of your meeting with Geouard at
                 that time at that location?

4

5              [PETITIONER'S COUNSEL]: Your Honor, I'm going to
               object.

6              THE COURT: Sustained.

7      Q:    [BY PROSECUTOR]: When you met with him, was he
                 alone?

8

9      A:    Yes, he was.

       Q:    Did you show him the photographic lineup containing --

10

11             [PETITIONER'S COUNSEL]: Objection, Your Honor.
               This is calling for hearsay.

12             [PROSECUTOR]: No, it doesn't.  I'm not asking his
                responses.  I'm asking did he do something.

13

14 (RT 828.)

15         Outside the presence of the jury, petitioner's attorney argued that the issue of

16 Dauterive's unavailability for trial had been discussed at length, and that in light of the court's

17 earlier rulings, the prosecutor's attempt to get into evidence the alleged fact that he had identified

18 petitioner in the lineup reflected prosecutorial misconduct.  (RT 829-31.)  This was especially

19 damaging, she explained, given that the trial court had ruled that defendants could not explain to

20 the jury that the witness was uncooperative and had failed to appear at trial.  Defense counsel

21 asserted additionally that the testimony was hearsay, and requested a mistrial.  (RT 830.)

22         The prosecutor explained her position, stating that she was merely trying to show

23 Dauterive had been cooperative two days after the robbery and that she had not been planning to

24 ask about "anything that came out of Dauterive's mouth," including whether he made an

25 identification.  The discussion continued:

26 ////

1        THE COURT:  You can't go there.  And what you did was
try and create an inference in the minds of the jurors that he
2   showed him a lineup, and if there was anything bad, if he couldn't
ID, then the defense would bring it up.

3
        So you know, what's the relevance?  What's the import of
4   showing him a photo lineup?  So what?  If you can't show what
happened, what's the relevance of it?

5
        [PROSECUTOR]: That two days after the robbery he's
6   cooperative.

7        THE COURT: [Petitioner's counsel] is absolutely correct.
She's been trying to show that he's uncooperative.  You've been
8   objecting, and I sustained your objection.  In my mind, you've gone
where you shouldn't go in having this officer testify that, "I
9   showed him a lineup," under the argument, "Well, this is just to
show that he's cooperative." . . .

10

11  (RT 834.)

12  Ultimately the court ruled:

13        All right.  Here's my impression on this.  This does not rise
to the level of a mistrial.  A mistrial- in most situations, granting a
14  mistrial should be seen as a remedy of last resort.  If possible, the
improper conduct should be cured by admonishing the jury.

15
        It is very helpful for the judge to inquire early in the trial
16  process as to any problem areas in order to avoid [or] anticipate a
situation like this.  This is why I spent so much time with you folks
17  in chambers in limine before we got rolling.

18        There are certain grounds for mandatory mistrial under the
Evidence Code.  This is not one of those.
19
        So the question is: What to do about it.  I don't have any
20  problem with admonishing the jury to disregard the last statement-
question and answer by the prosecutor about, "Did you show him a
21  photo lineup?"  They are to disregard that.

22        . . . .

23        . . . My opinion is, based upon the totality of the evidence in this
case, what's gone on before regarding photo lineups and in-person
24  identification, et cetera, et cetera, that the confusion on the various
witnesses' parts, I do not think that this is the type of prejudice
25  which rises to the level of a mistrial.  I think an admonition can
cure it.

26

28

1     The only question I'm considering now is whether or not to
      re-visit the issue of allowing them -- or however it was originally

2     proposed, to take judicial notice of the fact that Mr. Dauterive has
      had a bench warrant out for his arrest and has failed-- because he

3     has failed to appear.

4     . . . .

5     All right.  I'm going to go ahead and make that ruling, that
      you'll be allowed to do that . . . .

6

7     (RT 837-38, 840-41.)

8     When the jury returned, the court admonished:

9     Ladies and gentlemen, right at the break there was an
      objection lodged with respect to the last part of the prosecutor's

10    line of questioning with this officer, and I'm sustaining the
      objection.  It's with respect to questions and answers that had to do

11    with this officer allegedly showing a photographic lineup.

12    I'm ordering that not only is the objection sustained, but
      those questions and answers are stricken from the record, and I'm

13    admonishing each and every one of you to disregard those
      questions and those answers.

14
      Now, this is something that was mentioned when we were

15    in jury selection -- or actually, called the pretrial admonition, that if
      the Court rejects certain evidence, you're not to speculate as to why

16    it's rejected or what the reason for the objection was.

17    But what it further means, you're to disregard it completely,
      not to take it into account, and don't talk about it at any time

18    during the deliberations.

19    Do all of you understand that?  All right.  Thank you.

20    (RT 844-45.)

21    Then, at the conclusion of the People's case, the court stated to the jury:

22    [Petitioner's counsel] has properly asked the Court to take
      judicial notice of the Court's own file.  And that is proper in

23    certain cases under the Evidence Code for the judge to look in their
      own file and say, yeah, that's true, and then tell the jury what it is.

24    Okay.

25    So in this case, what she is asking that the Court take
      judicial notice of is that on a prior date wherein this case was

26    originally scheduled to start, which was January 13th of this year,

29

the person Geouard Dauterive, and that's spelled D-A-U-T-E-R-I-V-E, had been personally served with a subpoena to appear in court on that date, and failed to appear in court pursuant to that subpoena. And as a result, the court issued a bench warrant for Geouard Dauterive's arrest, and as of today, that warrant is still outstanding. And that is reflected in the court's file, and the Court will take judicial notice of that.

(RT 878-79.)

On direct appeal, the state appellate court rejected the claim, reasoning:

Defendants assert the prosecutor's questions effectively conveyed that Dauterive identified Herman Johnson.

"'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.... In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)

No evidence about any identification Dauterive may have made was admitted, due to defense counsel's prompt objections. Further, we presume that jurors follow instructions and admonitions except in very limited circumstances. (*See, e.g.*, *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648.) For example, a question including inflammatory and irrelevant content about a defendant (e.g., references to child molestation or terrorist activities) might cause prejudice even if the question is not answered. But in this case the questions merely asked the officer what he had done, not what Dauterive had said or done, and did not imply any inflammatory facts about Herman Johnson. The trial court promptly and thoroughly admonished the jury. We see no reason why the jury would have any inherent difficulty following the admonition, and therefore uphold the trial court's ruling denying the mistrial motion.

(LD 11 at 14-15.)

b. Discussion

Mr. Dauterive was alleged to be the victim in counts III and VI, but did not appear for trial. On direct examination the prosecutor asked Detective Wilder if he met with Mr. Dauterive, and if he showed him a photographic lineup. A defense objection was made before

1  the latter question was answered.

2          As the state appellate court noted, no evidence about any identification Dauterive

3  may have made was actually admitted.  In addition, the complained-of line of questioning by the

4  prosecutor, though improper, was brief in time and limited in scope.  The improper questions do

5  not appear to have been part of a larger pattern of improper conduct.  In the context of the whole

6  trial, the improper questions did not so infect the trial with unfairness that petitioner's resulting

7  conviction constituted a denial of due process.

8          The trial court's concern was the possible inference that if Dauterive was shown a

9  lineup, then any problem or issue with the line-up would be explored by the defense at trial,

10  which was impossible because Mr. Dauterive was not available.[6]  The court sustained the

11  objection and properly admonished the jury to disregard the entire line of questioning.  It is

12  presumed that the jury followed the court's limiting instruction.  See Greer v. Miller, 483 U.S.

13  756, 766 n.8 (1987).  This is not a case where the risk that the jury would not, or could not,

14  follow instructions was so great "that the practical and human limitations of the jury system

15  cannot be ignored."  See Bruton v. United States, 391 U.S. 123, 135 (1968).  In addition to giving

16  a curative instruction, the trial court modified its earlier evidentiary ruling and allowed the jury to

17  be informed that Mr. Dauterive had been served with a subpoena to appear in court, failed to

18  appear, and that a bench warrant had been issued.  Under these circumstances, there was no

19  substantial and injurious effect on the verdict.  The California Court of Appeal's rejection of

20  petitioner's claim regarding the reference to an absent witness was not contrary to or an

21  unreasonable application of clearly established federal law.

22  ////

23

24          [6] Petitioner also argues that the court's attempt to cure the error by informing the jury, as
    petitioner's counsel had previously requested, that Dauterive had failed to appear for trial made
25  matters worse because the jury would infer that Dauterive did not appear for trial because he was
    afraid of retaliation by petitioner.  (Dkt. No. 23 at consec. p. 22.)  Because petitioner provides no
26  support for this inference, the court will not consider it.

2.  <u>Alleged Improper Vouching</u>

a.  Background

In the rebuttal portion of the prosecutor's closing argument, she stated:

And one would ask, would the victims of this case, Lev Maslov and Mike Linsky, put themselves through nearly six hours of testifying here, probably about half as much at the preliminary hearing last September, and then, you know, hanging out and giving a statement to the police on the night of the robbery if there was no gun?  That's a significant investment and follow-through on this crime that these victims have put forth in this case.

Why did they come here and subject themselves to six hours of questioning by three different lawyers?  Do you think they did that for the heck of it?  Do you think the people in the construction industry are paid when they are not at work?  Usually they're not.  So there's a lot at stake coming here, and they took the prospect of testifying seriously.

Why did they come here and endure the hours of testifying that they did?  It's because there was a gun on that night, on that morning, in that hallway.

And think about it.  Mike Linsky got his keys back, and Lev Maslov got some of the property that was in his wallet back.  And so wouldn't you think, well, you know, hey, there was no gun, and we got our stuff back, so it's not -- why are we going to bother with this prosecution?  Keep it under the rug.

And I'll tell you, ladies and gentlemen, that's not the case here at all.  If they were -- if this was a robbery with no gun and they got their property back, what would be their motive?  And that's what the defense is saying, is that they're here, they're saying that this robbery happened with a gun.  And they repeated over and over there is no evidence of a gun.

(RT  994-95.)  Later the prosecutor continued:

Now, some comments were made about the victims being coached or being told what to say.  And I would like to say that if that were the case, then if -- you know, because there's nothing wrong with the DA meeting with the witnesses prior to putting on the case.   I mean, you would want to be prepared before you hit the stand if you had never testified before, so there's nothing wrong with that.

. . . .

. . . And you can tell right now that the witnesses were not

32

coached, because if they had been coached, wouldn't Lev Maslov have said everything under oath that Mike Linsky said?  There would be no discrepancies, no inconsistencies.

And if Mike Linsky had been coached, wouldn't he have pointed out the right person as the chubby one with the braids?  No.  That's how you know that these witnesses weren't coached, because there are fine lines.  There are discrepancies.  There are inconsistencies.  And that does not make a witness incredible.

(RT 1003-04.)

On direct appeal, the state appellate court rejected petitioner's claim that the prosecutor improperly vouched for witnesses:

Defendants contend the prosecutor improperly vouched for the victim-witnesses. This claim is based on statements made during the prosecutor's rebuttal argument, *to which no objections were interposed.* The failure to object forfeits the contention of error. (*People v. Ward* (2005) 36 Cal.4th 186, 215 (*Ward* ).) In any event it lacks merit.

""""[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation]...."' [Citation.] Nevertheless, '[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citation.] Nor is a prosecutor permitted to place the prestige of [her] office behind a witness by offering the impression that [she] has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [her] comments cannot be characterized as improper vouching.'" (*Ward, supra,* 36 Cal.4th at p. 215.)

1    In this case the prosecutor did not express her personal
     belief in the truth of the victim-witnesses. She asked rhetorically
2    why they would put themselves through the trouble of coming to
     court "if there was no gun;" she also referred to their construction
3    jobs, which would not pay them for coming to court, arguing
     "there's a lot at stake coming here, and they took the prospect of
4    testifying seriously." She later argued they were not coached,
     because if they had been "[t]here would be no discrepancies, no
5    inconsistencies."

6    Read in context, the prosecutor tethered the claims that the
     victims were truthful to facts in the record. The record citations
7    supplied do not support the defense claim that the prosecutor
     improperly vouched for their honesty.

8

9    (LD 11 at 15-16.)

10                  b.  Discussion

11          Respondent asserts that this ground is procedurally barred because the state court

12   held it was waived by petitioner's failure to object at trial.  As a general rule, a federal habeas

13   court "'will not review a question of federal law decided by a state court if the decision of that

14   court rests on a state law ground that is independent of the federal question and adequate to

15   support the judgment.'"  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129

16   (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  Even if the state

17   rule is independent and adequate, a claim may be still reviewed by the federal court if a petitioner

18   demonstrates: (1) cause for the default and actual prejudice as a result of the alleged violation of

19   federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of

20   justice.  Coleman, 501 U.S. at 750.

21          Since procedural default is an affirmative defense, respondent bears the burden of

22   pleading and proving that the state procedural bar is adequate and independent while petitioner

23   bears the interim burden of placing the adequacy of the defense at issue.  See Bennett v. Mueller,

24   322 F.3d 573, 585 (9th Cir. 2003).  Here, respondent met the initial burden by pleading that this

25   claim is procedurally defaulted for petitioner's failure to object at trial.  The burden then shifted

26   to petitioner to place the adequacy of the contemporaneous objection rule into question as "the

1   scope of the state's burden of proof thereafter will be measured by the specific claims of

2   inadequacy put forth by the petitioner."  Bennett, 322 F.3d at 584-85.  Petitioner's traverse does

3   not mention the procedural bar.  In his petition, petitioner does recognize the issue but simply

4   states, without any specific argument, that any objection would have been futile.  (Dkt. No. 23 at

5   consec. p. 23.)  This brief statement is insufficient to meet petitioner's burden of challenging the

6   independence and adequacy of the procedural bar.  See Bennett v. Mueller, 364 F. Supp. 2d

7   1160, 1172 (C.D. Cal. 2005) ("[A] petitioner may meet the interim burden under Bennett by

8   'asserting' the existence of case law or 'evidence' which appears on its face to show an

9   inconsistent application of the procedural bar."); see generally King v. Lamarque, 464 F.3d 963,

10  967 (9th Cir. 2006) ("Bennett requires the petitioner to 'place [the procedural default] defense in

11  issue" to shift the burden back to the government").

12          Petitioner also argues that any procedural bar should be excused because it was

13  caused by the ineffective assistance of his trial counsel.  (Dkt. No. 1 at consec. p. 12-13.)

14  Petitioner may not assert ineffective assistance of counsel as cause for his default unless he has

15  also raised that ineffective assistance of counsel claim in state court.  Edwards v. Carpenter, 529

16  U.S. 446, 451-52 (2000).  Petitioner did raise this claim of ineffective assistance of counsel on

17  appeal.  (LD 5 at 38-39.)  The Court of Appeal did not address it.  (LD 11.)  As described below,

18  because petitioner cannot show he would have succeeded on the merits of his claims of

19  prosecutorial misconduct, trial counsel's failure to object did not prejudice petitioner and he has

20  not shown that failure rose to the level of a constitutional violation necessary to establish cause

21  for his procedural default.  Edwards, 529 U.S. at 451 ("[I]neffective assistance adequate to

22  establish cause for the procedural default of some *other* constitutional claims [must] *itself* [be]

23  an independent constitutional claim.").

24          Petitioner's procedural default aside, petitioner cannot succeed on the merits of

25  this claim.  Petitioner's allegations of improper vouching are not supported in the record.

26  "Vouching consists of placing the prestige of the government behind a witness through personal

35

1    assurances of the witness's veracity, or suggesting that information not presented to the jury

2    supports the witness's testimony." United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.

3    1993); see also United States v. Simtob, 901 F.2d 799, 805 (9th Cir. 1990).

4            Improper vouching has been found, for example, where the prosecutor "plainly

5    implied that she knew [a Federal agent] would be fired for committing perjury and that she

6    believed no reasonable agent in his shoes would take such a risk." United States v.

7    Weatherspoon, 410 F.3d 1142, 1146 (9th Cir. 2005).  The court in Weatherspoon held that the

8    prosecutor's urging that legal and professional repercussions served to ensure the credibility of

9    the officers' testimony sufficed for the statement to be considered improper vouching based upon

10   matters outside the record.  Id.; see also United States v. Pungitore, 910 F.2d 1084, 1124 (3rd

11   Cir. 1990) (prosecutor's statement that federal agents would not have coached witnesses because

12   they would have "jeopardized our jobs, our careers, our right to practice law, they're [sic] right to

13   continue as FBI agents..." found improper).

14           Here, in contrast, the prosecutor did not express her own belief in the credibility

15   of any witness, or imply that any information not in evidence supported their accounts or assured

16   their credibility.  Rather, the prosecutor summarized facts in the record and used them to offer

17   reasonable inferences therefrom which supported her case, including that the victims had no

18   motivation to lie, that they would not have bothered to testify if there was no gun involved as the

19   defense claimed, and that discrepancies in their testimony demonstrated that they were not

20   coached.  In this regard, the jury was obviously aware that both men had taken the time to appear

21   to testify at trial.  There was evidence in the record that on the night of the robbery a wallet and

22   watch were returned to the victims (RT 733), and that Mr. Maslov recovered his wallet and Mr.

23   Linsky's keys after someone contacted his father and demanded $100 for return of the property

24   (RT 471, 483-84).

25           There was also evidence that both men worked in construction.  (RT 257; 422-

26   23.)  While no evidence was admitted at trial regarding whether construction workers are

typically paid when they are not at work, the prosecutor's statement that people working in the construction industry are "[u]sually" not paid when they are not at work is not comparable to the prosecutors' improper statements in <u>Weatherspoon</u> or <u>Pungatore</u> that no federal agent or prosecutor would ever risk being fired by committing perjury or coaching a witness.  The latter implied that government testimony was inherently credible because of the possibility of legal or professional repercussions, while the former simply drew an inference based on the common sense notion that construction workers are typically paid for their labor as opposed to being salaried employees.

All of the prosecutor's references were based on evidence that was in the record or upon inferences that could be reasonably drawn therefrom.  Moreover, nothing the prosecutor said gave the impression that she was personally aware of the witness' truthfulness.  The complained of statements did not constitute improper vouching.

Additionally, petitioner has not shown that he suffered actual prejudice.  In light of the evidence at trial against petitioner, there is no likelihood that the prosecutor's comments had a substantial and injurious effect or influence in determining the jury's verdict.  In addition to the testimony of Mr. Maslov and Mr. Linsky, there was testimony from police officers regarding the events on the night of the robbery.  Additionally there was evidence that both Mr. Maslov and Mr. Linsky identified petitioner as one of the robbers in a photographic lineup.

In sum, the complained of remarks during the prosecutor's closing argument about the victims' testimony did not make petitioner's trial so unfair that his resulting conviction constituted a denial of due process.  Accordingly, rejection of this claim by the California Court of Appeal was not contrary to or an unreasonable application of clearly established federal law.

### 3. Racial stereotypes

#### a. Background

During closing argument, petitioner's attorney pointed out that no gun was introduced into evidence and argued that there was no reliable evidence of the use of a gun

during the robbery.  (RT 948-52; 994-95.)  On rebuttal, the prosecutor sought to counter the claim:

> [The defense] repeated over and over there is no evidence of a gun.
>
> Incorrect.  There is evidence before you that a gun was in that hallway.  There just isn't a gun on the evidence table.
>
> And what is the evidence that you heard that there was a gun present?  Well, I went over that this morning.  Both Lev and Mike testified to how it looked, what type they thought it was.  And by that I mean nine millimeter or .45.  And that both of them said it was a real gun.
>
> And while Mike Linsky admitted that he's seen guns on TV, he's also seen them in real life.  So whatever knowledge that he has about guns doesn't just come from television.  He said that he had friends with guns.  He's seen them before.  He knows that nine millimeters and .45s are pretty close.
>
> Lev, on the other hand, said he didn't really know much about guns, and he didn't look all that attentively at this one, but he saw enough of it to know that it was a real gun.
>
> And you have to think about the context of what was happening in this hallway.  It was a robbery, ladies and gentlemen, an armed robbery.  And when you commit a robbery on multiple victims and in a public place like that, you are going to use a gun, because the thing is, we're not talking about a back yard barbecue, a couple twelve-year-olds, you know, toy gun or whatever.  That's the context, you know, where there are toy guns.
>
> But when you're going to take over multiple people in a public place, and you're going to do it in less than two minutes, you're going to do it with a real gun.
>
> Now, this is a picture of David Johnson taken when he was booked.  And in that photograph -- you know, booking photos are not flattering.  And but it goes to show you that people on the day they commit crimes don't look like they do in court.  And I submit to you that that is the face of somebody that can put a gun to Lev Maslov's head and tell everybody in the hallway to empty their pockets.
>
> Does he look like he would have used a fake gun or no gun, or that the victim, if they say that there was a gun, that he, in fact, used it?  And you'll see those photographs.

And the victims in this case are young Russian men.  And I believe that Lev did tell us that he was scared while this was happening.  And the fact that Deputy Miller didn't say that they looked scared doesn't mean that they were not scared.  It's just not an emotion that Deputy Miller remembers seeing.  He felt that it was more of an angry, shock kind of thing.  And that's the same thing that Les Maslov said, "I was shocked.  I stood there.  I didn't even go into my own pockets.  I had never been told to do that before.  And this guy goes into my pockets for me, and I've got a gun, you know, on my chin or on the side of my face or my jaw bone or on the back of my head."

(RT 995-97.)

Subsequently, also during rebuttal, the prosecutor stated:

Much was made about the scenario in which Mike Linsky got his keys back and Les Maslov got some of the property back from his wallet.  Counsel found that bizarre.[7]  It's just another tale or some of the fallout related to this robbery.

And I'd have to say that that's probably just the way the neighborhoods in North Highlands work.  It's an area of Sacramento County where it's a shame that somebody who found somebody's lost property on their lawn is going to turn around and charge somebody to get it back.

But you'll recall that at the time that Lev Maslov's father got the call, Lev hadn't told him that he had been robbed.  So you can just picture the father going, "Oh, you found my son's stuff on the lawn?"

"Yeah."

"I'll pay you to get it back because I want my son to have his stuff back."

After that, Lev was like, "Hey, I got robbed, and that's why this stuff is on the person's front yard," or whatever.  As bizarre as that may be to counsel, it is the fallout of a robbery.  You can picture that these defendants wouldn't have any use for, you know, somebody's Safeway Club Card or, you know, any other of the miscellaneous papers or receipts that Lev Maslov had in his wallet.

---

[7] This was apparently in response to co-defendant D. Johnson's attorney's argument that the evidence about Mr. Maslov's dad recovering some of his property after receiving a phone call and paying one-hundred dollars "makes this case entirely bizarre."  (RT at 967.)

They would take cash if there was any.  And it doesn't sound like there was.  And they didn't want the picture of the girlfriend -- or they did want the picture of the girlfriend.  I don't know.  That's the only thing that was in the wallet.  That just ended up on somebody's lawn.  And you can't fault the victims for trying to get their property back.

As you'll recall, Lev Maslov never got the keys to his Jetta back, despite his father going to this location and getting the property back.

(RT 1001-02.)

The California Court of Appeal rejected petitioner's claim:

Defendants contend the prosecutor injected racial stereotypes into the trial. Defendants concede they interposed no objection to this alleged conduct. "Accordingly, [they have] not preserved [their] claims." (*People v. Ochoa* (1998) 19 Cal.4th 353, 427-428.) In any event, the claims fail.

The first claim is that at one point in *rebuttal* argument the prosecutor held up a booking photograph of David Johnson and made a comment that was a veiled racial inference. Otherwise improper arguments may be fair if made in response to a defense argument. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026; *People v. Hill* (1967) 66 Cal.2d 536, 560-562 ["a prosecutor is justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record"].) However, tactics "appealing to or likely to incite racial prejudice" are improper. (*People v. Cudjo* (1993) 6 Cal.4th 585, 625-626.)

In the prosecutor's *opening* argument, she had held up or referred to photographs in evidence of Mitchell Green, Herman Johnson and David Johnson, arguing witnesses had consistently identified David Johnson as the person with the gun, that Herman Johnson helped, and that Mitchell Green was present but was the person who did not participate in the robbery. She argued the testimony and reasonable inferences therefrom showed David Johnson used a real gun.

David Johnson's counsel argued no gun was ever found and the story told by the victims and their demeanor indicated no gun was involved, that they were angry when the police arrived, but not afraid. *David Johnson's attorney held up his booking photo,* arguing it did not match the description given by the victims.

In partial response, the prosecutor commented that "people on the day they commit crimes don't look like they look in court. And I submit to you that that is the face of somebody that can put a

40

gun to Lev Maslov's head and tell everybody in the hallway to empty their pockets. [¶] Does he look like he would have used a fake gun or no gun, or that the victims, if they say that there was a gun, that he, in fact, used it? And you'll see those photographs. [¶] And the victims in this case are young Russian men. And I believe that Lev did tell us that he was scared while this was happening." She then argued that nobody could predict what a person's reactions would be after being held up at gunpoint.

Defendants contend the quoted passage, particularly the juxtaposition of "young Russian men" against the photograph of a Black defendant, was an effort to appeal to racial stereotypes on the part of the all-White jury. We disagree. The reference was to the *youth* and immigrant status of the victims, and the prosecutor was attempting to rebut the defense claim that the victims had not been scared when the police arrived. Defense counsel had herself referred to the same photograph, in an effort to show the image depicted did not match descriptions given to the police. It was quite proper for the prosecutor to refer to the same photograph and invite the jury to draw a different inference therefrom.

The second claim is that the prosecutor referred to a neighborhood in such a way as to portray it as a crime-ridden Black ghetto. The record does not support the claim.

Victim Linsky testified that his car keys had been taken but he got them back about a week later through Maslov. Maslov testified that a day or so after the robbery someone left a message with his father stating they had found some identification papers and receipts in front of their house and wanted $100 for them; Maslov's father retrieved the papers and Linsky's car keys.

The defense argued this was "entirely bizarre" and "just crazy," and suggested Maslov made up the robbery tale. In response, the prosecutor argued, "that's probably just the way neighborhoods in North Highlands work. It's an area of Sacramento County where it's a shame that somebody who found somebody's lost property on their lawn is going to turn around and charge somebody to get it back."

The lack of objection not only precludes our review of the claimed error, it suggests that trial counsel did not interpret the comment, in context, as a racist comment. In our view the remark was at worst a reference to *poverty,* not race. Nothing in the record shows this was designed to appeal to any racist stereotypes on the part of jurors. The remark was tied to the evidence and fairly responded to a specific defense argument about that evidence. We find no error.

(LD No. 11 at 16-19 (emphasis in original).)

2.      Discussion

The state appellate court indicated that this claim, too, was barred because of petitioner's failure to object at trial.  Again, respondent appropriately contends that this ground is procedurally defaulted.  And, again, petitioner has shown neither inadequacy of the procedural rule or cause for his failure to raise the issue at trial.  Accordingly, this claim, like the claim of improper vouching, should be barred by the procedural default doctrine.

In any event, this claim also lacks merit.  "The Constitution prohibits racially biased prosecutorial arguments."  McCleskey v. Kemp, 481 U.S. 279, 310 (9th Cir. 1987) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  But the prosecutor made no racially biased arguments in this case.

The prosecutor held up petitioner's booking photo and stated "that is the face of somebody that can put a gun to Lev Maslov's head and tell everybody in the hallway to empty their pockets."  This was in response to petitioner's attorney's argument that his booking photo did not match the description given by the victims.  As noted by the state appellate court, it was proper for the prosecutor to refer to the same photograph as referred to by defense counsel and invite the jury to draw a different inference.  It appears the prosecutor was simply trying to make the point that when people appear in court they do not appear the same as they did when they committed the crime.  There were no racial inferences to be drawn.

Shortly afterwards, the prosecutor commented that the victims in this case were young Russian men.  Again, this comment does not appear to have been racially motivated, but rather, was a reference was to the youth and immigrant status of the victims, in rebuttal to the defense arguments that the victims' demeanor and actions after the robbery were not consistent with those typically observed by police after a crime such as robbery at gunpoint has taken place.

Nor does it appear that the prosecutor's reference to the North Highlands neighborhood was intended to appeal to any racial biases on the part of the jury.  The defense had attacked the credibility of the victims, stating that the circumstances under which some of their

property was recovered were "bizarre," implying that there was more to the story than was told

by the victims.  The prosecutor responded "that's probably just the way neighborhoods in North

Highlands work.  It's an area of Sacramento County where it's a shame that somebody who

found somebody's lost property on their lawn is going to turn around and charge somebody to get

it back."  The state appellate court reasonably found that this was not a racial remark, but rather,

was fairly tied to the evidence in response to a specific defense argument about that evidence.

Moreover, it is not likely that these comments influenced the jury; they certainly did not have a

substantial and injurious effect or influence in determining the verdict, given the evidence in the

case as previously described.  Therefore, the California Court of Appeal's conclusion that

petitioner was not entitled to relief for his claims of prosecutorial misconduct is not contrary to,

or an unreasonable application of clearly established applicable federal law.

C. Alleged Ineffective Assistance of Counsel

As discussed briefly above, petitioner claims his counsel was ineffective for

failing to object to instances of alleged prosecutorial misconduct.  (Dkt. No. 1 at consec. p. 12-

13.)  The Sixth Amendment guarantees the effective assistance of counsel.  The United States

Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland

v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a

petitioner must first show that, considering all of the circumstances, counsel's performance fell

below an objective standard of reasonableness.  Id. at 687-88.  Second, a petitioner must establish

that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."  Id. at 694.  "[A] court need not

determine whether counsel's performance was deficient before examining the prejudice suffered

by the defendant as a result of the alleged deficiencies. . . . . If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be

followed."  Strickland, 466 U.S. at 697.

1    Since, as discussed in the previous section, the undersigned concludes that

2  petitioner should not succeed on his claims of alleged prosecutorial misconduct, petitioner

3  likewise has not shown he was prejudiced by counsel's failure to object.  Accordingly,

4  petitioner's ineffective assistance of counsel claim should be denied.

5    D.  Alleged Cumulative Error

6    Petitioner's final claim is that the cumulative effect of the alleged prosecutorial

7  misconduct errors constitutes a denial of due process.

8    The Ninth Circuit has concluded that under clearly established United States

9  Supreme Court precedent the combined effect of multiple trial errors may give rise to a due

10  process violation if it renders a trial fundamentally unfair, even where each error considered

11  individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007)

12  (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410

13  U.S. 284, 290 (1973)).  "The fundamental question in determining whether the combined effect

14  of trial errors violated a defendant's due process rights is whether the errors rendered the criminal

15  defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and

16  injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht v.

17  Abrahamson, 507 U.S. 619, 637 (1993)); see also Hein v. Sullivan, 601 F.3d 897, 917 (9th Cir.

18  2010) (same).

19    This court has addressed each of petitioner's claims and has concluded that no

20  error of constitutional magnitude occurred.  This court also concludes that the alleged errors,

21  even when considered together, did not render petitioner's defense "far less persuasive," nor did

22  they have a "substantial and injurious effect or influence on the jury's verdict."  Accordingly,

23  petitioner is not entitled to relief on his claim of cumulative error.

24  ////

25  ////

26  ////

VI. <u>Conclusion</u>

For all of the above reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  April 29, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

john2035.157